Clause number 13-11117, Murphy v. Verizon Communications. Appellant, ready to proceed? Yes, we are, Your Honor. Is the appellee ready to proceed? All right. Appellant, you may proceed. May it please the Court, I'm Curtis Kennedy of Denver, Colorado, and with me today is Robert E. Goodman, Jr. of Dallas, Texas, and we represent the appellants in this action, the unwanted retirees who were included in the spinoff transaction between Verizon and IDARC in the year 2006. Now, this Court has already dealt with one case involving the spinoff transaction recently. You decided, Judge King, Judge Graves, the U.S. Bank case, which was the bankruptcy trustee's claims, which I'll refer to as the creditor's case, and I hope that that outcome will not infect your decision-making here because this case involves unique claims under ERISA, totally different than the creditor's claims, and we're going to show you evidence that for one reason or another the creditors didn't know about or they chose not to utilize in their own action. What my friends who are masquerading as opponents and adversaries will want you to do today is go right to this issue of whether this was a settler function or a fiduciary function, and, of course, they're going to say it was all, everything was a settler function, and they don't want you, Judge King, to rely upon any of your well-reasoned decisions that you made in Busian. They'd rather that the Court focus attention on whether they complied with Section 208, which I'll refer to as the asset allocation mandate under ERISA. It says that when you're transferring assets, you have to transfer sufficient assets in order to make sure that nobody's going to be harmed by this transaction, but that only has to do with funding pension benefits. Section 208 is inapplicable for two reasons. First, the facts, which are undisputed and set forth in Docket 81, bear out that the fact that there wasn't even compliance with 208 until five days before we filed our lawsuit. It was three years and three days after a spinoff transaction that they finally transferred the final amount of money, which is actually what's called a true-up, along with interest to the spinoff entity. That's fine. That means they complied with 208. They did what's called a true-up, but 208 by itself is not an end-all. It does not bless the entire transaction. There are other issues that had to be complied with under ERISA. 208 did not relieve the fiduciaries of their obligation to act so as to promote the best interests of the unwanted retirees, and 406B2 says don't get involved in such a transaction because you're under a conflict. You should either always advocate for the best interest of the plan participants, or as we see in Busian, you should ask someone else to step in, an independent fiduciary of the sort. But you're talking about the duties of a fiduciary. The duties of a fiduciary. But don't we look in determining whether or not there's a fiduciary duty? Don't we look at the function which was being performed? The function that was being performed here was indeed a fiduciary function because we're talking about the transfer of assets, and the transfer didn't get completed until three years later. So all the while that meant that they still had fiduciary obligations. But when you're implementing a decision, you just don't divorce yourself from the obligation to continue to do what's in the best interest of the retirees. There's no doubt that IDR, from the beginning of this planning stages all the way to the end, did not want the retirees, and for good reason. And it went all the way up to the top of the chain of command. The CEO of IDR, Kathy Harless, went to the CEO of Verizon, Ivan Seidenberg, and said, this isn't a really good idea. We don't want the retirees. And what was the outcome? It was almost male chauvinistic. The CEO of Verizon tells her to stay out of the way. From now on, he'll deal with the guys. He'll deal with Andy and Mueller. And that's what happened. So there was no voice speaking up for the retirees during the implementation of the decision. And as it turned out, as we point out, there are four groups of retirees that would have been involved in this spinoff. The court is aware that there's management retirees that were former managers. There's non-management retirees that are former collective bargaining employees. And there's two groups. In each group, there's a group that's under pay status, immediately getting a check. And then there's a group of people who earned a pension in the future, the deferred vested pensions. Well, at the last bit of the transaction here, the management deferred pensioners were protected. They were held back by Verizon. So they didn't even treat everybody the same in that regard. But they didn't look out for the best interest when they implemented the decision. The fact of 406B2 is that you just don't put yourself in a position where you can't serve, always, foremost, the best interest of the plan participants. And I know the courts have kind of got lost in the language of 406B2, and sometimes they just don't read the plain language. But the fact is the Supreme Court has already made a comment about 406B2 long ago, and that was in 1981, the NRLB case versus Amex Coal Company. But somehow in the years since, courts have made a mistake, and everybody keeps making the same mistake. And the district court below just ignored the plain language and basically rewrote the statute as we have pointed out. It was just about six weeks ago that Judge Elrod of this court entered a decision in Tolbert v. RBC on July 14. And you read that brief at pages 7 and 8, and it looks like almost verbatim what we say. When Congress says something, it means what it says, and it says what it means. And every word has to be applied. You cannot ignore the fact that fiduciaries are prohibited from acting in an individual or in any other capacity in a transaction that is adverse to the interests of the planned participants. In order to do that, you have to buy into the notion that this was not a settlor decision as opposed to a fiduciary decision. But the decision, Your Honor, was made when they decided to do the spinoff. What they did subsequently is decide, well, who's going to be involved in the spinoff? And, you know, it was an evolving situation. And so they didn't insulate themselves by saying, well, we're acting now as a settlor capacity. The whole point of 406b-2 is that these people, the senior officers who are designated the fiduciaries of the plan, they shouldn't even be involved in advocating for the settlor. And why was all this done? The reason they stayed true to the settlor is simply for a short-term gain, to enhance shareholder value, and that's undisputed. This wasn't an arm's-length transaction. It was completely a cram-down. And we tried to find out all this information before we got into litigation, and that's one of our claims, is that one shouldn't have to go through this expensive, protracted effort to find out what's happened to your pension plan and who's handling it, what's going on with the funding, especially when a company's going through bankruptcy. And so we tried to find out all this information, and we didn't get it. We were stonewalled. We found out what we needed to know through the litigation process. But Ellman says, you know, we reserved, this court had reserved, for a day to decide under what circumstances, when a special request is made, should you comply with that. Well, this is a case where the court can take Ellman and go forward and say, the company should have provided all this information. So from the beginning to all the way through, the court has seen evidence that the fiduciaries weren't looking out for the plan participants. And there was no forewarning. There was nothing said in the SPD. You're not arguing that there was a fiduciary duty in connection with the decision to spin off, are you? The basic decision to do a spin off was a settler function. And it's just like in Boostian. We decide we're going to purchase an insurance annuity. That's a decision. But how you implement that decision and how you go about choosing the right people and whether you use an independent fiduciary, those are all fiduciary functions. And I want to point out, Judge Graves, your decision in Kohler, which is applicable in this case. The reason these retirees were so blindsided is that it wasn't a circumstance that was revealed in the SPD and of the regulation and the statute. And in Kohler, you said that the regulation requires much greater clarity and that didn't happen in this instance. And we asked for the investment guidelines, which were to enable the retirees to know exactly how the money is being managed, make sure it's not being put into a made-off fund, and that was denied to us. Well, the other circuits that have looked at that have said those are instruments under which the plan is operated and maintained. We didn't use the magic word governed. We did say that there are instruments under which the plan is operated and maintained. And I think the court, in three or four instances, has pulled a rabbit out of the hat and used contentions that weren't even raised by any of my friends in this section. And we're asking that the court reverse the judgment for the five central reasons we've argued and remand with instructions. They're trying to drop the gun and say, well, we want you to finish up the unfinished business. They come up with several arguments that weren't even addressed by the trial court below. So they know implicitly that this case wasn't completely resolved by the trial court below. I'd like to reserve my rest. Let me ask you a question. If this court were to affirm on the major issues here and then get to the question about whether you should have had the investment policy and so on, doesn't that moot that? No, it doesn't moot that because that's going to be a continuing issue. But I'm hoping the court will see and go back and revisit the Bousillon decision and see that it's just wrong to affirm the court below. But there's going to be continuing conflicts with plan participants when they ask for those kind of guidelines. But you can raise that question then. I mean, obviously you're looking for something different before this deal gelled than you were at this point or at some future point. You want it for a different reason. What we wanted to do is find out how did this happen, who was representing us, and why didn't we know about it and why weren't we informed? Now, the plans here provide for this possibility explicitly. Judge King, it applies for mergers and acquisitions, and that's what the retirees were accustomed to. They were accustomed to the companies getting bigger and better. And all the while it was an improvement. They permit the transfer of plan assets and liabilities. You know, in my 32 years of doing ERISA, I've seen a lot of plans that specifically say you can transfer assets, liabilities, and participants. And this is one of the few where it didn't actually say it. So the court has said implicitly that was allowed. Well, even the court's decision in that regard, which wasn't even raised by my friends, is not supported by any case law. And it undermines the whole point of ERISA so that the summary plan description informed people about what your rights are, what will happen in the future, and what are circumstances that can come about so that you can plan ahead and maybe you can even bring about changes, which I've done with other organizations. We didn't get that chance here, Your Honor. Thank you. Thank you. May it please the Court, I'm Jeffrey Uvell for the Verizon Appellees. Mr. Bristow will speak on behalf of Supermedia. My task here is made easier by the very careful and thoughtful opinion of Judge Fish below. I'd like to make three points about how ERISA bears on transactions of this nature. First of all, ERISA protects plan participants in this kind of transaction in two important respects. ERISA Section 204G prohibits any amendment to the plan that decreases the benefit of a participant. And as a practical matter, what that means is that there can be no amendment that changes the formula that restates the obligation to the employee in terms of what he's entitled in benefits. Secondly, Section 208 requires that the participant be entitled to the same benefit on a planned termination basis after the transfer of assets and liabilities as before. And that provision is actually much more complicated than it seems on the surface because it implicates ERISA's rules as to planned terminations, which are what you're entitled to upon a planned termination depends on how many assets are available and there are very extensive rules in Section 414 about how you calculate and determine those entitlements. But the net effect of it is that where the plan is adequately funded to give everyone a benefit on a planned termination basis before the transfer, they're entitled to it after, which means a certain amount of assets need to be transferred to satisfy that. And that was done here. There's no dispute that both of these important protections in terms of what the employee's entitled to and what assets are available in the new plan were satisfied. In fact, the assets transferred to the new plan amounted to something like $760 million, but on an accounting basis the plan only needed to be funded up to the level of $600 million,  and in effect they were satisfied, but the plan was adequately funded as required by ERISA. And there's no dispute here that there's been compliance here with both 204-G and 204-A. The second point about ERISA is the point that has been discussed already, the distinction between settler functions regarding to the design of a plan and fiduciary functions. And to respond to the comments by counsel, the record at 1593 is the plan amendment, which clearly identifies as part of the design decision to transfer these assets who would be the participants in the new plan, so that who was transferred is very much part of the design decision. It's not a fiduciary decision. Counsel mentioned the Boosian case where in terms of administering the assets of a plan, I think the facts were that the plan had a choice of four insurance companies to invest some of the money, and, of course, there was a fiduciary responsibility to be careful in reviewing the four possible insurance companies and pick one in a careful manner. But fiduciary duties are functional in nature, and a person is a fiduciary only when they're acting with discretionary authority over the administration and assets of the plan so that the decision here plainly doesn't implicate Section 404. Does a reservation of rights provision allow an employer to make any amendment to a plan at any time with regard to employee pensions without violating the notice provisions under 102B? Well, it does allow amendments. It allows amendments to the plan, and it gives employees notice of those amendments, and as I said, 204G ensures that the benefit is not decreased. We would maintain that the notice provision, SPD, it only applies in terms of giving people notice of a potential loss or denial of benefits, and the three plaintiffs have admitted in response to RFAs that they continue to receive the same benefit after the transfer as before, and the law requires that that be done. So in terms of the notice requirements, they're simply not implicated in our view. Judge Fish found that they were implicated, but they were satisfied by that reservation of rights provision. In terms of the prohibited transaction rule, if you look at the statute, every Section A-1, A-2, and B-1, each one starts a fiduciary shall not, no fiduciary shall, a fiduciary with respect to a plan shall not. So quite clearly, if you just read the statute, it only applies to fiduciary decisions. It doesn't apply to plan design decisions such as what was at issue here, and the cases are consistent with that. The Lockheed case, Supreme Court case, says that, and then there are cases from the Third, Sixth, Seventh, and Second Circuits, all of which deal with the argument of prohibited transactions and concluding that that only restricts fiduciary actions and therefore has no role to play in this kind of transaction because the decision to do a spinoff simply is not a fiduciary act. I have the impression, and I haven't looked it up, that there are now regulations dealing with spinoffs. Is that right? There are very detailed regulations relating to the funding in connection with the spinoff, and that goes from 208 and the issue of funding it on a planned termination basis. We reviewed that in some detail in our summary judgment papers. Judge Fish apparently reviewed that entire sequence and the complexity of those regulations and said in his opinion that it was, in terms of repeating those requirements, it was simply too tedious to go into. I had that impression, but the reason I ask that is that I can remember from many years ago that this kind of thing would come up and those regulations didn't exist. They do now. 26 CFR 1.414L is a very extensive set of regulations that deal with the funding and, again, reflect that both Congress in Section 208 and the regulatory authorities have given very careful attention to these kinds of transactions which have to occur as companies such as those in the telecom industry either acquire new companies, spinoff entities as their businesses evolve, so too must their pension plans, and basically both Congress and the regulators have given considerable thought to how to protect employees in connection with those transactions, and here there's no dispute that there's been compliance with both Section 208 and Section 204G. In terms of the SPD issue, as I said, Judge Fish found that there'd been no violation because there was adequate disclosure in the reservation of rights. We would argue that, in addition, that obligation's not even triggered because there was no harm, no loss, or denial of benefits. There's one additional argument that Judge Fish did not reach, which is the recent Supreme Court case, or not so recent, in Amara v. Cigna, says that to have a disclosure claim, one of the elements is you must allege harm. The Fifth Circuit law is very clear that where you're alleging harm, speculation's not sufficient, and here we would contend there's simply no meaningful allegation that any of the plaintiffs were harmed by any lack of disclosure in the SPD. Thank you. May it please the Court. Scott Brister and David Whittlesey with Andrews Kurth for Supermedia Employee Benefits Committee. We're the managers of the plan into which these folks were transferred from Verizon, and the novel claim against my client is whether ERISA gives members a right to demand documents from the plan when they have no claim against us for benefits. The documents they want won't help them make a claim for benefits, and the documents, in fact, give them no rights of any kind. There is no claim for benefits against us. The past benefits have all been paid. The plans are adequately funded for the future. The investment guidelines they want don't give them any rights because we don't let the plan members say, well, I don't want to invest in tobacco stocks, or I don't want to invest in hedge funds. Members don't get to pick that, and so if they don't like our investment guidelines, they don't get to sue us and make us change them. That's what we have investment managers to do. I'll spend just a second on why investment guidelines is the only thing that they pleaded and preserved. It's not enough to plead. We asked for plan-related documents because we can't tell if that's plausible or not. You're entitled to some plan-related documents and not others, and just saying I didn't get some plan-related documents doesn't tell us Judge Breyer's phrase recently in Fifth Third. It doesn't separate the plausible sheep from the meritless goats. You've got to be more specific than that, and the only thing that is both pleaded in the complaint and still preserved in their appellate briefs is investment guidelines. Now, the deal on investment guidelines is this. There's a difference between Section 104 and Section 404 of ERISA. 104 is papers you have to give to members. 404 is performance we expect from managers. Those are two different things. 401 is you've got to give them copies of this stuff. 404 is the managers have to comply with these things, and they've mixed those two up in the brief against us because it is true there's a Department of Labor bulletin, and there are some cases that say you have to give investment guidelines, and they're all in cases where somebody's plan lost a bunch of money on a bad investment. And, yes, if Dean Witter loses the plan's money and you want to sue Dean Witter and say you weren't prudently investing, you may be able to get the investment guidelines to see if Dean Witter was following them. But they don't have a claim like that against us. We haven't lost money on investments. They don't have a claim that because of that we need to see whether you followed the investment plans. We haven't had any bad investment plans. They've got to go under 104, and 104 does say there's certain documents you have to give people if they request. But it can't be what they say, which is just, well, if it's any document under which the plan is governed. Think for a minute. I assume most plans probably have a sexual harassment policy and a discrimination policy and being courteous to people on the phone policy. Well, now, are those other instruments under which the plan is operated? Well, broadly construed, yes. But these things are things not only you have to give a member on written request, but you have to set up a document repository under 404B2. The same things have to be put in a document repository so they're available for examination by any plan participant. Well, I mean, if it's just that, if it's everything about operations, then your whole office is the document repository. I think they're misinterpreting that because it's under B, 404B, starts with this. Both the title and the first line says, publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries as follows. One, two, three, four, upon written request. It's describing when you send them summary plan descriptions and annual reports, which, of course, are mandated because they're supposed to give people everything they need to know to pursue a claim. You just have a few minutes. Can you discuss the Kajanek decision a little bit? Right. Kajanek is they wouldn't tell me how to get a rollover. They wouldn't tell me how to get my benefits, and I think they have to do that. I think if it's, I think that's under, you could put that under either 404 or 104 because it has to do, this is not something they have a right to change. We put it under 404 in that case, I think. Yes, right, and I think that's, if you say this is hurting my benefits, you know, 404 says you've got to do, you've got to discharge your duties solely for the member's benefits as a prudent investor with diversification in accordance with the instruments of the governing plan. So you're saying I want to make a claim for my benefits and you won't give me the papers to do that, or I want to make a claim that you're not being a prudent investor and you won't give me the documents to prove that claim. I think under those circumstances you might be able to get some of these documents, but that's different from 104 because they're not making any of those claims. We haven't breached, they don't allege we breached any fiduciary duties of any kind. They just say this is something you have to give everybody. That's a 104 claim, and that ought to be reserved for the statutorily required kind of plan. So in conclusion, of course the main purpose, all I'm saying is the main purpose of ERISA is not producing paper, it's protecting pensions, and they're not saying we need this to protect our pensions. All they say is we need this so we can use it against Verizon. So I agree with you, Your Honor. If there's no claim against Verizon, then the claim against us is Moot, because that's what they wanted the papers for. Thank you. Thank you. Roboto. Your Honor, what's been lost in all the discussion is that there's a judicial admission that this whole transaction was imposed upon IDR, and we point that out in our appellate briefs. And the centerpiece of how it was imposed is in the record at page 2559. That's the CEO-to-CEO discussion. And I want to point out that Section 208 is not the floor. It does not bless the transaction, and there are no cases that say that 208 excuses everybody else from complying with the other provisions of the statute, the 406B2, don't get into a conflict of interest, and the 404 issues. The plan amendment that they want this court to address on the retroactive basis wasn't even retroactive all the way. They couldn't shoot straight because they started transferring assets and people on November 1. The plan amendment done on December 22 was made retroactive to November 17. So it didn't even cover when they first acted to transfer assets. And what the courts have said consistently, when you always act as a fiduciary every time you transfer assets, regardless of what you're doing with the assets, that's a fiduciary function. And in regard to the notice, they want to point out that the notice is only required when there might be a loss or denial of benefits. That's not true. The regulation says that you have to provide notice of the circumstances that may result in loss, denial, ineligibility, and offset. That means you get the same benefits, but maybe they're going to be offset because you're going somewhere else, or maybe you're going into an annuity or a different pension plan. But there wasn't any such disclosure. But they made sure of that. They made sure that they put that in their SPDs close to a year after the retirees were transferred. So that's an admission that they know it should have been in the SPDs from the get-go. When dealing with the settler function here, they cannot insulate everything that happens just because they say, well, now we're going to do a spinoff. What if it takes three years to figure out what's the best thing to do for the people? When they were choosing to use these assets for the spinoff as part of the way to enhance the shareholder value, they had to choose which people would go with it. And I could never understand how you can tie people to surplus assets because the huge aircraft decision by the Supreme Court says, if they're surplus assets, the plan participants aren't linked to it. They have no right to complain about what's done with it. They have no interest in it. Well, I think that goes both ways. If the company wants to transfer surplus assets, they cannot just pick and choose who goes with it. And if you're doing that, you're managing the assets, and you're doing a fiduciary role. You're playing God. You're deciding which of the retirees are going to be linked to the very surplus monies that you're giving away to IDARC. And that's what happened here, and that's what we keep saying over and over. It was a fiduciary function. And what's been lost in the statute that was violated, the 406b2 language, the plain words say that a fiduciary shall not, in his individual or in any other capacity, any other capacity, that means as an officer, as a director, as an agent, as a girlfriend, as anything in a transaction that's adverse to the interest of the retirees. And we've shown that. There's harm all over the field here, and they knew that. They knew that it wasn't in their best interest from the beginning. And that's because they barely gave enough funding for what the retirees' needs were. They did not give $1, one penny, to deal with the package of benefits that all these people earned by putting in all their years of service. All these people at Verizon, there's 100,000 of them, they've all earned a package. And everyone that's at Verizon still gets the whole package, the life insurance, the welfare benefits, everything that goes with being a good long-term service employee. That's the basic problem from your standpoint, is that because you're not a part of the Verizon plan anymore, you don't get the health benefits and all the rest of it. It's really not about this pension. That was part of the deal. You know, it's one of the terms of the pension plan. The pension plan says right in, and that makes it unique, the pension plan says if you're eligible for a service pension, you're going to get all these other things as well. And we point out that language in our briefs. And that's one of the unique things about these Bell System pension plans, is that it did provide right within the pension plan document that you get your health care and welfare benefits. Verizon hasn't done anything negative to them, and it's one of the richest companies in America. So you've got to wonder, why would they get rid of all these unwanted retirees? It was simply to enhance shareholder value, and it was all wrong. We ask you to reverse and remand and order the trial court also to give attorneys fees and costs for our efforts. Thank you. Thank you very much. The court will take this matter under advisement.